GIMBELS MIDWEST, INC., Respondent, v. NORTHWESTERN NATIONAL INSURANCE COMPANY OF MILWAUKEE, Appellant.

*No. 622 (1974). Argued March 4, 1976.—*
*Decided April 7, 1976.*
(Also reported in 240 N. W. 2d 140.)

For the appellant there were briefs by *Kenneth M. Kenney* and *Wolfe, O'Leary, Kenney & Wolfe* of Milwaukee, and oral argument by *Kenneth M. Kenney*.

For the respondent there was a brief by *John W. Emmerling* and *Edward D. Styles* of Milwaukee, and oral argument by *Mr. Emmerling*.

BEILFUSS, J. At the time the policy was issued and at the time of the fire, the land upon which the building was located was owned by the plaintiff, Gimbels Midwest, Inc. The building was operated and maintained by Miller Enterprises, an unincorporated association consisting of the heirs of one Ely Miller. In January 1927, Ely Miller entered into a forty-nine year lease of the property with Schuster Realty Company, Gimbel's predecessor in title and interest. The expiration date of the lease was December 31, 1975.

Under the terms of that lease, Miller, as lessee, was to construct a building worth no less than $40,000, to pay annual rentals to the lessor, and to surrender the property to the lessor at the expiration of the lease. In addition, lessee was to pay all real estate taxes, keep the property in good repair, and insure the building against fire in an amount no less than 80 percent of its value. It was pursuant to the latter provision that Miller Enterprises procured the policy in question, with a face value of $55,000, from the defendant Northwestern National Insurance Company. The policy contained a standard mortgage clause which provided that loss or damage under the policy would be paid to the "mortgagee [or trustee] as interest may appear." Gimbels was named as the mortgagee.

Immediately following the fire representatives of Miller Enterprises and the defendant insurance company sought

to adjust the resulting claim under the policy. Miller retained Strauss Zahn, Inc., public adjusters, to represent its interests. The parties reached a compromise agreement which set the amount of loss at $14,206.47, and the actual cash value of the property at $64,700. A "sworn statement in proof of loss" was executed reflecting the agreement on August 2, 1972. The defendant issued a Wisconsin Insurance Plan loss draft, dated August 24, 1972, in the amount of $14,206.47. The draft was sent initially to Miller Enterprises. Miller's attorney, M. P. Frank, forwarded the unendorsed draft to Gimbels on August 31, 1972.

Prior to that time, on July 18, 1972, John W. Emmerling, attorney for Gimbels, sent a letter to the defendant insurance company informing it of Gimbels' interest in the property under the lease and requesting that any settlement draft be made payable to the First Wisconsin Trust Company, as trustee. Emmerling sent a second letter to the defendant on September 14, 1972, acknowledging receipt of the draft. The letter provided in part:

"We are awaiting receipt of an assignment from Miller Enterprises of their interest in the insurance claim and certain other information; so the draft cannot be negotiated at this time.
"We assume this will cause no problem in view of the 90-day deadline for presentation stated on the draft."

Prior to the fire, and beginning in late 1971, Miller Enterprises had been in default on the monthly rental payments due under the lease. By the terms of the lease, the lessee was to pay $5,500 annually for the period beginning January 1, 1969, and ending December 31, 1975, when the lease was to expire. A reduction to $5,000 had previously been negotiated. Attorney Frank advised his client to discontinue rent payments. During late 1971 or early 1972 he had discussions with representatives of Gimbels in an unsuccessful attempt to negotiate a release

of Miller Enterprises from its lease obligations. During the same period of time Miller was also in default in its installment payments of property taxes due for 1971.

Following the fire Frank was contacted by Martin Lederer, a Gimbels' representative, with regard to the fire loss. Frank asked Lederer to again see what could be done to release Miller from its obligations under the lease. Frank also agreed to have Miller Enterprises apply for a reduction in the real estate taxes assessed for 1972. The objection to the assessment was filed on June 26, 1972. On October 24, 1972, the city of Milwaukee granted a reduction in the total assessed value of the land and property for 1972 from $16,940 to $8,640.

On July 18, 1972, Gimbels issued a "Notice of Defaults" letter to Miller Enterprises. The letter noted Miller's defaults in rent and tax payments and its failure to repair the building following the fire as required by the lease. The letter designated the First Wisconsin Trust Company as the bank to which all insurance proceeds payable by reason of the fire loss were to be paid. The letter also provided that Gimbels was "not adverse to continuing to discuss with you or your attorney our mutual problems with respect to the demised premises in the hope that we can reach a mutually satisfactory compromise solution of those problems."

Subsequently, in early August, Frank met with Emmerling and Lederer to further discuss the status of the lease relationship. At that meeting there was some discussion concerning the negotiations between the defendant and Miller Enterprises regarding the amount of the fire loss. Tentative arrangements were made to release Miller from the lease and from all obligations as to past due rents and taxes. Following the meeting Frank sent Emmerling copies of the insurance policy and section 14-4 of the Milwaukee City Ordinances. That section relates to the authority of the municipality to order the condemnation of buildings which constitute a menace to

public safety. On August 17, 1972, Emmerling wrote to Frank acknowledging receipt of the materials and outlining Gimbels' position regarding settlement of the fire loss claim. Specifically, Emmerling was concerned with "whether we could possibly recover the entire $55,000 face amount of the insurance policy."

Other correspondence between the parties followed. Frank procured a title report on the property and forwarded it to Emmerling on August 23, 1972. On the same day Miller Enterprises executed a quitclaim deed of its interest under the lease to Gimbels. On September 15, 1972, Miller assigned to Gimbels its rights under the insurance policy.

On September 21, 1972, Emmerling made a personal visit to the city of Milwaukee building inspector's office and conferred with Matthias F. Schimenz, city inspector of buildings, regarding the status of the damaged property. Following that meeting the department conducted an inspection of the building. On October 24, 1972, the raze order was issued. That order provided in part:

"An inspection of the 2-story masonry and office building located at the above address revealed some deferred maintenance. The building has recently been severely fire damaged. The roof, second flood partitions and floors are fire and water damaged. The first floor has been water damaged. The cost of repair has been estimated to exceed 50% of the equalized value as determined by the Wisconsin Department of Taxation. This building is unfit for further occupancy and use and unreasonable to repair."

On October 27, 1972, Emmerling wrote to the defendant on behalf of Gimbels, informing it that the assignment from Miller Enterprises of rights under the policy had been completed. Emmerling also notified the defendant of the raze order, returned the unendorsed loss draft, and requested the issuance of a new draft for the face amount of the policy on the ground that "there has been a con-

structive total loss of the building insured under the above policy." A second letter renewing that claim and furnishing "supplemental proof of loss" was sent on December 14, 1972.

The defendant insurance company, as a party affected by the order, commenced an action in circuit court on November 30, 1972, to restrain enforcement of the raze order. That action was dismissed as not timely brought and the building was subsequently demolished. No appeal was taken in that case.

Upon the defendant's refusal to pay the face value of the policy, Gimbels commenced this action. In its amended complaint Gimbels set forth the facts concerning the fire, the assignment of rights under the policy, the raze order and its claim, and alleged that a constructive total loss had occurred by reason of which the defendant was required to pay the full face value of the policy. The defendant answered, responding to each of the plaintiff's allegations and setting forth six affirmative defenses. Gimbels moved for summary judgment on its claim and, in the alternative, for an order striking the defendant's six affirmative defenses. The defendant also moved for summary judgment, seeking a dismissal of Gimbels' complaint.

In its decision on the motions the circuit court first determined that all but two of the defendant's affirmative defenses should be struck. By its first affirmative defense the defendant asserted that the sworn statement in proof of loss executed by Miller Enterprises constituted a compromise settlement of the fire loss claim. The court held that this defense would be available to the defendant if it could prove the elements of its fifth defense. By that defense the defendant alleged that Gimbels should be equitably estopped to assert its claim for the face value of the policy because it "encouraged" or "inspired" the issuance of the raze order. The court was of the opinion that if the defendant proved the elements of estoppel

this state's valued policy law (sec. 203.21, Stats.) would be inapplicable and the compromise agreement would be binding on Gimbels. Because the material facts were found to be in dispute on the estoppel issue, both parties' motions for summary judgment were denied.

The case proceeded to a trial before the court on May 2, 1974. In its opinion following the presentation of testimony the court held that the defendant had failed to show that the plaintiff had "coerced" the department of building inspection into issuing the raze order. Because the defendant had failed to timely challenge its reasonableness, the raze order was held to conclusively show a "constructive total loss" and was subject to the value policy law.

The basic issue on this appeal is whether, under the circumstances of this case, the defendant is required by this state's valued policy law, sec. 203.21, Stats., to pay the full face value of its policy. That section provides:

**"Total loss measured by amount written in policy.** Whenever any policy insures real property and the property is wholly destroyed, without criminal fault on the part of the insured or his assigns, the amount of the policy shall be taken conclusively to be the value of the property when insured and the amount of loss when destroyed."

It is not disputed that the actual loss occasioned by the fire in this case was $14,206.47 and that the cash value of the insured building at the time of the fire was $64,700. It is also undisputed that, following the fire, the city of Milwaukee ordered the building razed. In *Gambrell v. Campbellsport Mut. Ins. Co.* (1970), 47 Wis. 2d 483, 177 N. W. 2d 313, this court held that when, as a result of an insured loss, the owner is precluded from rebuilding and is required by the municipality to destroy the insured building, a constructive total loss results and the valued policy law applies to require the insurer to pay the full face value of the policy.

The defendant argues that *Gambrell* should not control the disposition of this case. Its first argument is that the "sworn statement in proof of loss" executed by the named insured, Miller Enterprises, and fixing the amount of loss at $14,206.47, constitutes a valid compromise agreement on the claim which is binding on the plaintiff as assignee. The trial court was of the opinion, however, that a compromise agreement or settlement of a fire loss claim for less than the face value is of no binding effect where the valued policy law applies. We agree.

In *Gambrell*, this court noted that the provisions of the valued policy law are as much a part of the insurance contract as if they were actually written into the policy. The effect of that law, when a total loss occurs, is the same as a contract for liquidated damages.[2] As such, where a total loss occurs, settlements for less than the face value of the policy are invalid as unsupported by adequate consideration. More importantly, because the valued policy law is based upon public policy, the parties cannot waive its provisions even by express contract.[3] An attempted settlement for less than the face value where there has been a total loss, constructive or otherwise, is void *ab initio* as contrary to public policy.

The defendant, nevertheless, argues that the plaintiff should not have the benefit of the valued policy law under the circumstances of this case. It contends that, for reasons of public policy, assignments of rights under fire insurance policies where there is the potential for a constructive total loss because of condemnation should not be countenanced. As a general rule, however, there appears to be no impediment to the assignment of claims

---

[2] *See: Fox v. Milwaukee Mechanics' Ins. Co.* (1933), 210 Wis. 213, 217, 246 N. W. 511; 44 Am. Jur. 2d, *Insurance*, p. 555, sec. 1645.

[3] *See: Reilly v. Franklin Ins. Co. of St. Louis* (1877), 43 Wis. 449, 456; 15 Couch, *Insurance* (2d ed.), p. 391, sec. 54:123.

under fire policies after the loss has occurred.[4] Moreover, the facts do not support the defendant's assertion that the plaintiff "purchased" the rights under the policy intending to "speculate" about the possibility of recovering the face value. It is clear that Gimbels, as lessor, possessed an insurable interest in the property at all times. It was listed, albeit incorrectly, as mortgagee under the policy's mortgage clause. In addition, on July 18, 1972, before the discussions which led to the assignment began, Gimbels fully apprised the defendant by letter of its true interest in the insured property. Under these circumstances we find no public policy reason to invalidate the assignment in question. It is true that at the time of the assignment there had not yet been a raze order issued concerning the property. However, the two key prerequisites to the issuance of that order—the property's assessed value and the extent of the damage— were fixed immediately following the fire and prior to the assignment as will be referred to below.

The defendant also contends that the plaintiff should not recover because it "inspired" or "encouraged" the issuance of the raze order. It argues that the circuit court's finding to the contrary is unsupported by credible evidence.

The defendant relies, initially, on the August 17th letter from John Emmerling, attorney for Gimbels, to M. P. Frank, attorney for Miller Enterprises, which contains an extended discussion of the law governing the recovery of the face value of a fire policy in the event of a loss. In that letter Emmerling stated that "the first and most important point to mention is that no settlement with Northwestern National Insurance Company should be concluded until we have completed our evaluation of this entire situation and agreed as to the position to be taken with that company." Emmerling also indicated that he

---

[4] *See:* 43 Am. Jur. 2d, *Insurance,* pp. 686, 687, sec. 689.

was not aware whether Miller Enterprises had entered into a binding agreement with the defendant, nor whether "such an agreement, if there is one, would be binding upon Gimbels Midwest, Inc." Emmerling did close the letter by stating that "with some $41,000 at stake, an effort should be made to establish a claim for the face amount of the policy based upon a constructive total loss." A reading of the letter as a whole does not indicate, as the defendant contends, a plan to induce a raze order where one would not otherwise be issued. At the trial Emmerling stated his concern in the letter was with recovering the face value in the event of a condemnation.

The testimony at the trial also revealed that Emmerling paid a personal visit to the city of Milwaukee building inspector's office on September 21, 1972, six days after Miller Enterprises had executed the assignment to Gimbels of its rights under the policy. Emmerling stated the purpose of the visit was to find out what should be done about the damaged building. Emmerling conferred directly with Matthias Schimenz, city inspector of buildings. Following that meeting arrangements were made to conduct an inspection of the building by the department. An inspection was required under the ordinances before a repair permit would be issued to authorize the repair of a fire-damaged structure.

Lester Daniel, a department employee, performed the actual initial inspection. His inspection survey sheet, dated October 2, 1972, bears the longhand notation "rehab or raze." The words "rehab or" are crossed through with a series of horizontal lines and the further notation "owner wants bldg condemned" appears near the bottom. Daniel testified that he wrote the words "rehab or raze" on the sheet at the time of the inspection and that they represented his judgment, based on the on-site inspection, that it was physically possible to repair the building. The words "rehab or" were crossed out at a later date and

the notation "owner wants bldg condemned" was added when Daniel later reevaluated the inspection at the request of his supervisor, John Vajcekauskis.

Daniel stated that Vajcekauskis told him that the owner wanted the building condemned and that he was to reevaluate the damage to see whether it reached the required statutory percentage of the building's market value for condemnation. It was part of the policy of the building inspection department, Daniel stated, to give a building owner the opportunity to repair a fire damaged building in some cases if he desired to do so. The decision to issue the raze order was made on the basis of the estimated cost of repairs as compared with the latest assessed value of the property. That information was unavailable to Daniel at the time the initial inspection was made and the inspection survey sheet completed.

John Vajcekauskis testified that he had been called into Schimenz' office where he met Emmerling. The three discussed the status of the damaged building and Schimenz told him to conduct an inspection. According to Vajcekauskis, Emmerling stated that the building was severely damaged and wanted to know if it was feasible to repair it. Vajcekauskis could not recall telling Daniel that the owner wanted the building condemned.

We believe that this evidence supports the circuit court's finding that the conduct of Emmerling manifested only "a desire to afford his client with proper representation in exploring all avenues open before reaching a well-informed decision," and that there was no attempt to coerce the building inspector into issuing the raze order. The findings of a trial court sitting without a jury will not be set aside on appeal unless they are contrary to the great weight and clear preponderance of the evidence.

The authority of a municipality to condemn damaged or neglected property is governed by the provisions of sec. 66.05, Stats. Sec. 66.05 (1) (b) provides:

"Whenever a municipal governing body, inspector of buildings or designated officer determines that the cost of such repairs would exceed 50 percent of the assessed value of such building divided by the ratio of the assessed value to the recommended value as last published by the state supervisor of assessments for the municipality within which such building is located, such repairs shall be presumed unreasonable and it shall be presumed for the purposes of this section that such building is a public nuisance."

In this case Gimbels concedes that the "cost of repairs" may be taken as $14,206.47; the amount arrived at as a compromise between the defendant and Miller Enterprises shortly after the fire. The original tax assessment of the building for 1972 was $15,290. This assessment was later reduced, upon an objection filed by Miller Enterprises, to $6,990. While the change occurred after the fire, James Klein, district assessor for the city of Milwaukee, testified that the fire damage was not taken into account in making the reduction. That reduction was effective as of May 1, 1972, one month before the fire.

It is undisputed that the city of Milwaukee assessed property at 54.43 percent of the equalized assessed value in 1972. For purposes of applying the statutory formula, the market value of the building under the original assessment was $28,090. After the reduction the value was $12,842.18. In either case, as the plaintiff points out, the "cost of repairs" exceeded 50 percent of the statutory value. The city was therefore authorized, under the statutory formula, to issue the raze order.

In *Gambrell*, this court held that where a raze order is issued, a constructive total loss results and the value policy law applies, requiring payment of the full face value of the policy of insurance. This result is justified on the ground that the insured owner does not have the option of repairing the damaged building and, as to him,

the fire loss may as well have been total. There was testimony in this case that the building was physically capable of being repaired and that, at least in some cases, the owner is given the option of repairing even when the cost of repairs exceeds 50 percent of the statutory formula value. However, in this case the owner did not have the option. The order of the city was to raze.

We therefore do not reach the question of whether, where the owner is given the option to repair or raze, the insurer is required to pay the face value of the policy under the valued policy law.

Sec. 66.05 (3), Stats., provides in part:

"Anyone affected by any such order shall within 30 days after service of such order apply to the circuit court for an order restraining the inspector of buildings or other designated officer from razing and removing such building or part thereof or forever be barred. . . ."

A fire insurer is "affected" by a raze order within the meaning of this section and may, therefore, challenge its validity.[5] However, it is equally clear that the cited section provides the exclusive remedy for challenging such an order.[6] The defendant concedes that it commenced an action to restrain enforcement of the order in this case more than thirty days after its issuance and that that action was dismissed as untimely. As the trial court noted, the defendant was notified of the raze order by the plaintiff within seven days of its issuance and cannot now claim that it had an insufficient opportunity to challenge it under the exclusive statutory procedure. In *Gambrell,* the court held that an insurer is chargeable with notice of sec. 66.05, Stats., that a building cannot be rebuilt if it is damaged more than 50 percent. It is

---

[5] *See: Gambrell v. Campbellsport Ins. Co., supra; State ex rel. Home Ins. Co. v. Burt* (1964), 23 Wis. 2d 231, 127 N. W. 2d 270.

[6] *See: Siskoy v. Walsh* (1963), 22 Wis. 2d 127, 125 N. W. 2d 574; *Oosterwyk v. Milwaukee* (1959), 7 Wis. 2d 160, 96 N. W. 2d 372.

equally chargeable with notice that an action to challenge a raze order must be brought according to the statute. The defendant places considerable reliance on *Kotlarsky v. Fidelity Union Fire Ins. Co.* (1933), 137 Kan. 609, 21 Pac. 2d 305, where, upon somewhat similar facts, the Kansas Supreme Court held that a policyholder who had solicited a letter from the fire marshall ordering the insured building razed was not entitled to the benefits of the Kansas Valued Policy Law. It is clear from that case, however, that a key to the holding was the jury finding that the building could have been repaired and that the municipal authorities would have permitted that repair. Here the defendant is precluded from making such a showing by its failure to timely pursue the exclusive statutory remedy.

We conclude that Gimbels should not be equitably estopped from relying on the raze order, that the raze order is conclusive and constitutes a constructive total loss of the building, and that Gimbels is entitled to recover the face value of the policy.

*By the Court.*—Judgment affirmed.