A&A ENTERPRISES, Plaintiff-Appellant,†

v.

CITY OF MILWAUKEE, a Wisconsin corporation, by and through the Department of Neighborhood Services, Defendant-Respondent.

Court of Appeals

*No. 2007AP300. Submitted on briefs November 30, 2007. —Decided February 20, 2008.*

2008 WI App 43

(Also reported in 747 N.W.2d 751.)

---

† Petition to review denied 5/13/08.

480

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *K. Scott Wagner* and *Jacques C. Condon* of *Hale & Wagner, S.C.*, of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Grant F. Langley*, City Attorney, *Vincent J. Bobot*, Assistant City Attorney, and *Adam Stephens*, Assistant City Attorney.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J. A&A Enterprises (A&A) appeals from an order denying its motion for a permanent injunction and dismissing its complaint. Following a bench trial, the trial court concluded that the City of Milwaukee's (the City) February 2, 2005 order directing A&A to repair its building at 2436 West Kilbourn Avenue or have it razed within sixty days was reasonable; and that there was no basis for the trial court to issue a permanent injunction to enjoin the execution of the City's order. We agree and affirm the order.

## I. Background.

¶ 2.   A&A owns a multi-unit apartment building and property located at 2436 West Kilbourn Avenue in Milwaukee (collectively, the Property). Purchase of the Property took place in April 2002 and included, in addition to the Property, two vacant lots, and a multi-unit apartment building located at 915 North 24th Street (24th Street Property). Prior to A&A's purchase of the Property, it sat vacant for a number of years. In 2000, a board-up order was issued to the then-owner of the Property, Campus Circle, after the City received a complaint that the Property was unsecured and people were accessing it through a broken window. Campus Circle obtained a demolition permit even though the Property had not been condemned at that time. For reasons undisclosed in the record, demolition never took place.

¶ 3.   A&A is a sole proprietorship owned by Andrej Sitarski. According to Sitarski, the renovation work associated with A&A's April 2002 purchase was "a huge undertaking," and he was unable to simultaneously work on the two buildings involved. As a result, his renovation plan consisted of three phases:   (1) repair the roof and secure the Property; (2) after securing the Property, focus on renovating the 24th Street Property; and (3) following occupancy of the 24th Street Property, return focus to the Property to complete the renovation work. Sitarski testified that while he was negotiating the purchase, he discussed his tri-phase plan with the then-alderman for the district where the Property is located and received the alderman's "blessing."

¶ 4.   Preventative maintenance was performed on the Property. Specifically, in the six months following A&A's purchase of the Property, a new roof was added,

483

and "the remnants of a decade of filth and squatting" were removed.[1] In early 2004, a new front door and windows were installed at the Property. Wherever the windows were accessible, with the exception of the front windows, A&A had them boarded to prevent them from being broken. In addition, boards were placed over the new front door to prevent trespassing.

¶ 5.   In the fall of 2004, A&A received an occupancy permit for the 24th Street Property. A&A then refocused its attention on the Property where it had the gutters, spouts, front facade, and parapet walls repaired and had electrical wiring installed for common areas. Around the same time, in October 2004, a City condemnation inspector, based on an exterior review of the Property, deemed it "not a condemnation candidate."

¶ 6.   In November 2004, Sitarski received a letter from the district's new alderman requesting a meeting regarding the Property. Sitarski testified that during the meeting, the alderman advised him that homeowners in the vicinity of the Property had called seeking to have the Property razed, and that it would be in Sitarski's best interest to comply with the request for a raze.

¶ 7.   Following the meeting, in December 2004, the City condemnation inspector again came to the Property, and this time he inspected its interior with Sitarski. After the inspection, Sitarski received a letter from the City condemnation inspector advising that the Property was condemnable and that Sitarski would be served with an order to raze and remove the building. The letter further stated:   "YOU ARE NOT PERMIT-

---

[1] Testimony at trial reflected that while the Property sat vacant, it was broken into by homeless people and used as a shelter. Cleanup entailed removal of everything from furniture and clothing to human feces.

TED TO PERFORM ANY REPAIRS ON THIS BUILD-ING AT THIS TIME. THIS BUILDING MUST RE-MAIN VACANT AND SECURED." (Emphasis in original.) When asked at trial when he made the determination that the Property was a condemnation candidate, the City condemnation inspector testified, "I think maybe about five minutes after I walked in the front door." The inspector's report reflected his assessment that 100% of the Property's interior would need to be gutted and his estimate that the cost of renovation would total $500,000. Sitarski testified that prior to receiving the letter from the City, he was never told that the Property was unsafe or that it had to be closed and secured.[2]

¶ 8.  Sitarski next received an order, dated February 2, 2005, advising as to a number of conditions at the Property violating Milwaukee ordinances and requiring him to correct the violations within sixty days or raze and remove the building. The order further informed Sitarski that pursuant to MILWAUKEE, WIS., ORDINANCE § 218–9 (2004) the Property could be declared a nuisance and A&A could be ordered to bring the Property into compliance with the code of ordinances or have it razed.[3] In response, Sitarski filed an appeal with the Standards and Appeals Commission (SAC).

¶ 9.  During the hearing held on May 19, 2005, Sitarski presented a plan to SAC showing that he anticipated having six apartment units of the Property

---

[2] According to Sitarski's trial testimony, approximately two weeks after receiving the letter, he learned that the City was considering rezoning the district where the Property is located from multi-family residential to two-family residential.

[3] All references to the Milwaukee Code of Ordinances are to the 2004 version.

ready for occupancy by December 2005.[4] SAC subsequently granted a variance to A&A allowing it to repair the Property subject to a number of conditions, one of which was that six apartment units be ready for tenancy by September 30, 2005.

¶ 10. There was testimony at trial that a number of the SAC's conditions were not satisfied, and it is undisputed that the six units were not ready for tenancy as of the specified date. In an effort to explain the delay, Sitarski testified that an inspection of the Property took place around September 2005 and asbestos was discovered; however, he acknowledged later in his testimony that even if asbestos had not been discovered, the units would not have been ready for tenancy.

¶ 11. In October 2005, the City sent Sitarski a letter advising that pursuant to WIS. STAT. § 66.0413 (2003–04), and because of Sitarski's failure to comply with the terms and conditions of the variance he was granted, the City was revoking SAC's decision and would proceed with razing the Property.[5] In response, A&A filed a lawsuit against the City, alleging that the February 2, 2005 order was unreasonable, in violation of § 66.0413 and requesting injunctive relief.

---

[4] The record reflects that the hearing was adjourned once at Sitarski's request in an effort to afford him additional time to develop a complete scope of work for the Property.

[5] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

In the trial court, A&A argued that the City's unilateral revocation of the variance violated A&A's due process rights because SAC, not the City, had the authority to revoke a variance. This issue is not argued on appeal because in the summer of 2006, SAC revoked the variance previously afforded to Sitarski allowing him to repair the Property.

¶ 12.   There was testimony at trial that the City had received complaints regarding the Property after it was purchased by A&A. The final complaint received by the City came in the wake of a murder that occurred in the gangway between the Property and a neighboring property. The owner of a neighboring property testified that he had observed criminal activity taking place outside the Property and was denied insurance for his home due to the Property's boarded-up condition. The supervisor of the City Condemnation Division testified that although the City had received complaints during the interim period while A&A was to be readying the six apartment units for tenancy, the City attempted to give Sitarski as much latitude as possible so that the objective of occupying the six units could be met.

¶ 13.   Following trial, the court denied A&A's motion for a permanent injunction enjoining execution of the February 2, 2005 order and dismissed A&A's complaint. In arriving at this conclusion, the trial court held that the February 2, 2005 order directing A&A to repair the Property or have it razed within sixty days was reasonable and that there was no basis for the court to issue a permanent injunction enjoining execution of the order. The trial court stated:

> I think on this evidence, the question was whether the City's conduct was reasonable.
>
> I'm satisfied that it was because I think that we have a number of issues here.
>
> We have the plaintiff who purchased this building with eyes open, had an opportunity to know what kind of a building at that time it was, probably vacant . . . maybe nine years, eight years at the time the building was purchased.

It was a boarded-up, abandoned building at the time or vacant building at the time it was purchased.

A&A is an investment company and maintenance company and apparently does this for a business. That is their business. They're not an unsophisticated purchaser.

There is an argument made that A&A is a small business person, but that cannot be an excuse. They chose to buy property. They chose to buy two extensive properties and chose to start with one building and then move to the other.

Maybe they did have an understanding with the City that that would be okay at the time of beginning the process.

I think on this record, there is a lot of evidence of latitude given by the City at various times.

The exhibits are not disputed. Notices were given that certain things be done by a certain time.

We have undisputed testimony from inspectors who said they didn't push on the little things that were not done. They gave latitude.

They weren't bird dogging this site saying, "The light is not up in 30 days," "This fence is not here," "This has not been done." The wanted the property to move forward and get it rehabbed.

The trial court also noted that it was struck by Sitarski's testimony that he would need an additional eighteen months before the Property would be habitable. Furthermore, no comprehensive repair plan was in the record, only various proposals and estimates, which the trial court did not find persuasive.

¶ 14. With respect to its credibility evaluations of the witnesses, the trial court commented:

> [T]he testimony of Mr. Sitarski has to be colored by his lack of recall of details of the purchase price, of when things happened, what certain things cost.
>
> The number of ["]I don't recalls["] of Mr. Sitarski in his testimony was startling given that it is this person who is coming in saying, "Trust me. I will finish the building in the time I estimate and I have not been given proper time to complete this property."
>
> I think it shows lack of understanding of the seriousness of the compliance with the [City]'s rules and requirements.

The trial court further stated that it found the testimony of the City's inspectors credible.

¶ 15. A&A now appeals. Additional facts are provided in the remainder of this opinion as needed.

## II. ANALYSIS.

■

¶ 16. A&A argues that the City did not comply with ORDINANCE § 218-9 when it declared the Property a nuisance. Our review and the interpretation of a municipal ordinance is a question of law subject to *de novo* review. *Board of Regents of the Univ. of Wis. v. Dane County Bd. of Adj.*, 2000 WI App 211, ¶ 11, 238 Wis. 2d 810, 618 N.W.2d 537.

■

¶ 17. Following a bench trial, we review a trial court's factual determinations under the clearly erroneous standard. WIS. STAT. § 805.17(2) (2005–06) ("Findings of fact shall not be set aside unless clearly errone-

ous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). We are presented with a question of law in determining the reasonableness of a building inspector's order. *Village of Williams Bay v. Schiessle*, 138 Wis. 2d 83, 88, 405 N.W.2d 695 (Ct. App. 1987). We typically determine questions of law independently. *Wassenaar v. Panos*, 111 Wis. 2d 518, 525, 331 N.W.2d 357 (1983). However, because the trial court's legal conclusion as to reasonableness "is so intertwined with the factual findings supporting that conclusion, the appellate court should give weight to the trial court's decision, although the trial court's decision is not controlling." *Id.*

¶ 18.   Finally, with respect to the trial court's denial of injunctive relief, "[o]ur review . . . is limited to whether the court erroneously exercised its discretion." *Shanak v. City of Waupaca*, 185 Wis. 2d 568, 588, 518 N.W.2d 310 (Ct. App. 1994). We will deem the trial court to have erroneously exercised its discretion if that discretion was either not exercised or if there was no reasonable basis for the trial court's decision. *Bubolz v. Dane County*, 159 Wis. 2d 284, 296, 464 N.W.2d 67 (Ct. App. 1990); *see generally City of Brookfield v. Milwaukee Metro. Sewerage Dist.*, 171 Wis. 2d 400, 423, 491 N.W.2d 484 (1992) (replacing the term "abuse of discretion" with "erroneous exercise of discretion").

A.   *The City's act of declaring the Property a nuisance was not contrary to law.*

¶ 19.   A&A argues that the City's nuisance declaration is contrary to law because the City never provided A&A with an order to close or secure the Prop-

erty, as required by ORDINANCE § 218–9. Furthermore, A&A argues that the City never told it that the Property was unsafe, or that it had to be closed and secured prior to the City's nuisance declaration, in accordance with § 218–9. Based on these facts, A&A contends that the nuisance declaration is invalid and the resulting raze order must be set aside.

¶ 20. WISCONSIN STAT. § 66.0413(4) provides the authority for the City to order a building razed. It states:

> (4) First class cities; other provisions. (a) First class cities may adopt by ordinance alternate or additional provisions governing the . . . razing and removal of a building and the restoration of the site to a dust–free and erosion–free condition.

> (b) This subsection shall be liberally construed to provide 1st class cities with the largest possible power and leeway of action.

Milwaukee is a first-class city. *See* WIS. STAT. § 62.05(1)(a) ("Cities of 150,000 population and over shall constitute 1st class cities."). Pursuant to § 66.0413(4), the City adopted § 218–9 of its ordinances. In pertinent part, § 218–9 provides:

> **218–9. Unsafe or Vacant Noncompliant Buildings. 1.** NUISANCE DECLARATION.

> a. Requirements for Declaration. The commissioner may declare a building a nuisance and order the building's owner to make the building safe and code compliant or have it razed and removed whenever all of the following are true:

> a-1. The building is found to be in violation of this code.

> a-2. The building is unsafe and has been ordered

491

closed, pursuant to s. 200–11, or the building is vacant and has been ordered secured pursuant to s. 275–32–7 or s. 218–4.

a-3. The conditions described in subds. 1 and 2 exist at least 6 months after the order to close or secure the structure has been served upon the owner.

b. Additional Factors. Additional factors which may be considered by the commissioner in determining whether a structure constitutes a nuisance include, but are not limited to, whether the building has been the subject of re-board or clean-up orders, complaints received by the department, or police or health department reports.

¶ 21. In 2000, prior to A&A's purchase, a board-up order was issued to the then-owner of the Property, Campus Circle. Campus Circle obtained a demolition permit even though the Property had not been condemned at that time.[6] However, for reasons undisclosed in the record, the demolition never took place. A&A was aware that the Property was vacant and boarded when A&A bought it.

¶ 22. Although Sitarski confirmed during his testimony that a title search was done, he was unable to recall whether the title search revealed that a demolition permit had been taken out for the Property. The City argues that if a title search was done, it would have revealed that a demolition permit had been pulled for the Property. A&A neither addresses nor refutes this in

---

[6] The board-up order and demolition permit issued as to the Property are matters which a reasonable investigation of the status of an obviously boarded up, long-vacant building would have disclosed to a commercial property rehabilitation business such as A&A. A simple question to Campus Circle as to why the property was boarded up seems the most basic of due diligence.

its reply brief. We deem the omission a concession on this point. *See generally Stuart v. Weisflog's Showroom Gallery, Inc.*, 2006 WI App 109, ¶ 4, 293 Wis. 2d 668, 721 N.W.2d 127, *review granted*, 2007 WI 16, 298 Wis. 2d 94, 727 N.W.2d 34 (holding that cross-appeal issues were conceded when party failed to respond in reply brief to the cross-respondent's argument).

¶ 23. Consequently, we conclude that a title search would have put A&A on notice that a demolition permit had been pulled for the Property. Had A&A inquired into the circumstances surrounding the issuance of the demolition permit, it would have learned that a board-up order was issued to Campus Circle.

■

¶ 24. We hold that, under the circumstances here, the board-up order issued to Campus Circle triggered the six-month time frame specified in ORDINANCE § 218–9. After A&A's purchase, the City afforded it numerous opportunities to make the Property safe and code compliant, which A&A failed to take advantage of before the City declared the Property a nuisance. Were we to hold that the notice given to the Property's prior owner, Campus Circle, did not satisfy § 218–9's requirements, a nuisance declaration could be avoided simply by a change of ownership. Such a result does not strike us as sound public policy.

¶ 25. Support for our holding can be found in WIS. STAT. § 66.0413(2)(c)3., located in the statute governing the razing of a building that is a public nuisance, which states:

> It is not a defense to an action under this subsection [i.e., razing a building that is a public nuisance] that the owner of record of the property is a different person or entity than the owner of record of the property on or

493

after the date the action was commenced if a lis pendens was filed before the change of ownership.[7]

(Footnote added.) Although a lis pendens was not filed in the instant matter as there were no pending judicial proceedings involving the Property, the overriding principle of § 66.0413(2)(c)3. is pertinent here where a title search revealing the demolition permit would have had the same effect as a lis pendens by putting A&A on notice that further investigation should be made to determine the circumstances surrounding the issuance of the demolition permit. *See Kensington Dev. Corp. v. Israel*, 142 Wis. 2d 894, 904, 419 N.W.2d 241 (1988) ("The sole purpose of a lis pendens is to give constructive notice to third parties of pending judicial proceedings involving real estate."). Further investigation on A&A's part would have revealed the City's issuance of a board-up order. Just as it is not a defense to an action under § 66.0413(2)(c)3. "that the owner of record of the property is a different person or entity than the owner of record of the property on or after the date the action was commenced," we see no reason why a similar result should not ensue here where A&A attempts to avoid a nuisance declaration based on the fact that it was not the owner of record at the time the board-up order was issued.

■

¶ 26.    Next, A&A argues that "a nuisance declaration addresses the *present* condition of the building, not how it appeared four years earlier." We agree. Although the board-up order issued to Campus Circle triggered the six-month time frame specified in ORDINANCE

---

[7] The City's ordinances provide that except as otherwise provided, the City adopts WIS. STAT. § 66.0413 as part of its code. MILWAUKEE, WIS., ORDINANCE § 218–01.

§ 218–9, after A&A's purchase of the Property, the City provided it with numerous opportunities to make the Property, *in its condition at that time,* safe and code compliant.

¶ 27. Neither the statutes nor the ordinance placed a time limit on the City to carry out the raze order. *See* ORDINANCE § 218–9.1.a-3. ("conditions described in subds. 1 [i.e, the building violates the code] and 2 [i.e., the building is unsafe and ordered closed or vacant and ordered secured] exist *at least* 6 months after the order to close or secure the structure has been served upon the owner" (emphasis added)); *see also Mohr v. City of Milwaukee,* 101 Wis. 2d 670, 677 n.3, 305 N.W.2d 174 (Ct. App. 1981), *reversed on other grounds by* 106 Wis. 2d 80, 315 N.W.2d 504 (1982) ("It should be noted that these statutes [citing the precursor to WIS. STAT. § 66.0413, *see* 1999 Wis. Act 150, §§ 134–149] do not place a time limit upon the municipality to carry out a properly issued raze order."). Therefore, even though the trigger for the ORDINANCE § 218–9 action occurred prior to A&A's ownership, the conditions that lead to the nuisance declaration were those existing at the time of A&A's ownership.

*B.   The City's raze order was reasonable.*

¶ 28. The reasonableness requirement for raze orders is set forth in WIS. STAT. § 66.0413(1)(h). This statutory provision enables persons affected by raze orders to apply for orders restraining the building inspectors or other designated officers from razing the buildings at issue. *Id.* At the hearing afforded by the statute, "[t]he court shall determine whether the raze order is reasonable. If the order is found reasonable the court shall dissolve the restraining order. If the order is

found not reasonable the court shall continue the restraining order or modify it as the circumstances require." *Id.*

¶ 29. The ordinance governing the razing of structures provides that all unsafe buildings, "consistent with the conditions specified in s. 218–9[.]1[.], are declared to be a public nuisance, endangering life, limb, health or property, and shall be repaired and made safe, or razed and removed in compliance with this chapter." MILWAUKEE, WIS., ORDINANCE § 218–4.1. The statutory definition of "public nuisance" states:

> [A] building that, as a result of vandalism or any other reason, has deteriorated or is dilapidated or blighted to the extent that windows, doors or other openings, plumbing or heating fixtures, or facilities or appurtenances of the building are damaged, destroyed or removed so that the building offends the aesthetic character of the immediate neighborhood and produces blight or deterioration.

WIS. STAT. § 66.0413(2)(a)2. Notably omitted from this definition is a requirement that the building constitute a "total loss."

¶ 30. Notwithstanding, A&A argues that the City's raze order was unreasonable for the following reasons: (1) it was grounded on an invalid nuisance declaration under ORDINANCE § 218–9; and (2) the facts do not support the trial court's decision given that the building was not a total loss. Because we previously concluded that the nuisance declaration was valid, A&A's first argument fails, and we turn to A&A's second argument, which hinges on whether the building located on the Property was a total loss.

¶ 31. To support its position, A&A relies on the fact that in 2005, the City reassessed the value of the Property at $151,600, reflecting an increase of $54,100 from the assessed value of $97,500 in 2004, which it contends refutes a finding that the Property was a total loss. Likewise, A&A points out that remodeling of the Property was on-going at the time the raze order was issued; it had new windows and a new front door installed and other improvements were made.

¶ 32. A&A, citing *Mohr*, apparently relies on the following language:

> In *Gambrell v. Campbellsport Mutual Insurance Co.*, 47 Wis. 2d 483, 177 N.W.2d 313 (1970), the supreme court stated:
>
>> An administrative order of a municipal building inspection department directing the razing of a burned building is a legislatively approved declaration that for public policy reasons the damage to the property constitutes a total loss.
>
> *Id.* at 490, 177 N.W.2d at 316. Similarly, in *Gimbels Midwest, Inc. v. Northwestern Insurance Co.*, 72 Wis. 2d 84, 96, 240 N.W.2d 140, 147 (1976), the court held that the issuance of a raze order results in a constructive total loss of the structure.

*Mohr*, 101 Wis. 2d at 675–76. Both *Gambrell* and *Gimbels* discussed total losses in relation to fire insurance policies; nevertheless, we do not dispute that a constructive total loss occurs *following* the issuance of a raze order. *Gimbels*, 72 Wis. 2d at 96. We disagree with A&A, however, insofar as it seemingly attempts to impose a requirement on the City to prove that the Property was a total loss *prior* to issuance of the raze

497

order.[8] We do not read *Mohr* to graft in the additional total loss requirement urged by A&A.

¶ 33.  Pursuant to ORDINANCE § 218–4, unsafe buildings, "consistent with the conditions specified in s. 218–9[.]1[.], are declared to be a public nuisance, endangering life, limb, health or property, and shall be repaired and made safe, or razed and removed in compliance with this chapter." We have already concluded that the conditions specified in ORDINANCE § 218–9.1. were complied with. Moreover, the Property also fits within the statutory definition of a public nuisance.

¶ 34.  To constitute a public nuisance, the Property must be deemed to "offend[] the aesthetic character of the immediate neighborhood and produce[] blight or deterioration" due to, among other things, the damaged and destroyed nature of its "windows, doors or other openings, plumbing or heating fixtures, or facilities or appurtenances." WIS. STAT. § 66.0413(2)(a)2. An exhibit introduced at trial contained the City condemnation inspector's conclusion that 100% of the Property's interior would need to be gutted, with an estimated renovation cost of $500,000. The violations noted in the City's February 2, 2005 order included, among other things:

3.  The door units, or components of these elements of the building, are defective.

4.  The window units, or components of these elements of the building, are defective.

. . . .

---

[8] A&A writes:  "A raze Order implies a 'total loss' on the Property, *see Mohr* [*v. City of Milwaukee*], 101 Wis. 2d [670,] 675[, 305 N.W.2d 174 (Ct. App. 1981)]; the City has proven this not to be the case." It continues, "How can a building that is undergoing repairs be a 'total loss'?"

9.    The building heating appliance(s), or compo-
      nents of these elements of the building, are
      missing.

10.   The building heating distribution system(s), or
      components of these elements of the building,
      are missing.

11.   The plumbing system, or components of this
      element of the building, is missing.

In addition, the owner of a neighboring property testi-
fied that he had observed criminal activity taking place
adjacent to the Property and was denied insurance for
his home due to the Property's boarded-up condition.

¶ 35.   Despite these facts substantiating that the
Property was a public nuisance, A&A takes issue with
the trial court's failure to address the increased ap-
praisal value and other improvements made to the
Property and its focus instead on events that took place
after the raze order was issued.[9] Our review of the
record does not support A&A's criticism of the trial
court's findings.

¶ 36.   The record reflects that the trial court ac-
knowledged that A&A did some preventative mainte-

_____

[9] Pursuant to Wis. Stat. § 66.0413(1)(c), if it is "deter-
mine[d] that the cost of repairs of a building [subject to a raze
order] would exceed 50% of the assessed value of the building
divided by the ratio of the assessed value to the recommended
value . . ., the repairs are presumed unreasonable." This is not
the theory advanced by the City to support the reasonableness
of the raze order issued in this case. Nevertheless, due to A&A's
emphasis on its increased assessment, we deem it worthwhile to
point out that although the Property's appraisal value increased
from $97,500 in 2004 to $151,600 in 2005, the condemnation
inspector estimated that renovation costs for a gut-rehab of the
Property would total $500,000.

nance on the Property to prevent further deterioration and also that A&A had renovation work performed. The trial court noted the complaints made regarding the Property and the different actions taken in response to the complaints, which were documented in the trial exhibits. The trial court also referenced the City condemnation inspector's testimony as to his observations regarding the condemnable nature of the Property.

¶ 37.  In arriving at its determination that the City's raze order was reasonable, the trial court pointed out A&A was not an unsophisticated purchaser and the fact that it is a small business was not an excuse for its failure to repair the Property within the periods of time it was allowed to do so. Likewise, the trial court was not persuaded by A&A's attempt to show bad motive on the part of City officials. Instead, the trial court emphasized the evidence reflecting the considerable latitude given by the City to A&A so that A&A could accomplish the necessary repairs.

¶ 38.  The foregoing facts, coupled with the deference we afford the trial court's reasonableness determination, *see Wassenaar*, 111 Wis. 2d at 525, lead us to conclude that the City's raze order was reasonable.

*C.  Denial of injunctive relief was appropriate.*

¶ 39.  "To obtain an injunction, a plaintiff must show a sufficient probability that the defendant's future conduct will violate the plaintiff's right and will irreparably injure the plaintiff." *Shanak*, 185 Wis. 2d at 588. A&A argues that the trial court erred in denying it injunctive relief because it will suffer irreparable harm due to the fact that the building located on the Property will be destroyed. Furthermore, because zoning for the

neighborhood where the Property is located has changed to single family units, A&A argues that it will not be able to rebuild an apartment building.

¶ 40. A&A has not demonstrated that the City's future conduct will violate a right to which it is entitled due to our conclusions that the City complied with ORDINANCE § 218–9 and the raze order was reasonable. *See Shanak*, 185 Wis. 2d at 588. Accordingly, we uphold the trial court's denial of injunctive relief. Were we to conclude otherwise, any property owner subject to a raze order would be entitled to injunctive relief due to the destruction that results from such an order, which would defeat the purpose of WIS. STAT. § 66.0413 and related ordinances.

*By the Court*—Order affirmed.

¶ 41. FINE, J. (*dissenting*). A&A Enterprises bought the property in 2002. The circuit court has ordered its building destroyed, and the Majority affirms. I respectfully dissent.

¶ 42. As the Majority concedes, the City of Milwaukee has not complied with MILWAUKEE, WIS., ORDINANCE § 218–9.1.a-3, which mandates that "[t]he conditions described in subds. 1 and 2 exist at least 6 months *after the order to close or secure the structure has been served upon the owner.*" (Emphasis added.) The Majority says that that is OK because: (1) A&A Enterprises had constructive notice that a § 218–9.1.a-3 order had been served on a *prior* owner; and (2) both the City and the circuit court deem the building to be razable. The second reason is, of course, immaterial *unless* the City has complied with the ordinance. Insofar as the first reason is concerned, the ordinance does not say "after the order to close or secure the structure has been

served upon *a prior* owner"—it says *"the owner."* (Emphasis added.) Governmental bodies must comply with their rules, *see Gloudeman v. City of St. Francis*, 143 Wis. 2d 780, 785, 422 N.W.2d 864, 866 (Ct. App. 1988), and we may not rewrite those rules to excuse, as the Majority does here, non-compliance, *see State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 52, 271 Wis. 2d 633, 667, 681 N.W.2d 110, 126.[1]

---

[1] As for the Majority's passing "public policy" rationale, *see* Majority, ¶ 24, there is *no* evidence in the Record that the sale to A&A Enterprises was a sham transaction to permit the prior owner to avoid the effect of the order served on it. Such a sham transaction can be dealt with when and if it is presented in another case; it is not presented here.