# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2020AP1113

Complete Title of Case:

### U.S. BLACK SPRUCE ENTERPRISE GROUP, INC.,

#### PLAINTIFF-APPELLANT,

### V.

### CITY OF MILWAUKEE,

#### DEFENDANT-RESPONDENT.

| | |
|---|---|
| Opinion Filed: | March 15, 2022 |
| Submitted on Briefs: | May 13, 2021 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Donald, P.J., Dugan and White, JJ. |
| Concurred: | |
| Dissented: | Donald, P.J. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Mark F. Foley* and *Matthew J. Thome* of *von Briesen & Roper, S.C.*, in Milwaukee. |
| Respondent ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief of *Tearman Spencer* and *Nicole F. Larsen* of the *City of Milwaukee Attorney's Office*, in Milwaukee. |

**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**March 15, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2020AP1113**

Cir. Ct. No.  2019CV6570

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**

---

U.S. BLACK SPRUCE ENTERPRISE GROUP, INC.,

PLAINTIFF-APPELLANT,

V.

CITY OF MILWAUKEE,

DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Milwaukee County: WILLIAM S. POCAN, Judge. *Reversed and cause remanded with directions.*

Before Donald, P.J., Dugan and White, JJ.

¶1 DUGAN, J. U.S. Black Spruce Enterprise Group, Inc. (Black Spruce) appeals the order of the circuit court upholding three raze orders issued by

the City of Milwaukee, Department of Neighborhood Services (the City) on April 11, 2019.

¶2 On appeal, Black Spruce argues that the City's raze orders are unreasonable because the City did not meet the requirements of WIS. STAT. § 66.0413 (2019-20),[1] for issuing the raze orders. Black Spruce contends that the buildings have never caused injury to anyone and, therefore, cannot be deemed unsafe under the raze order statute. Black Spruce also argues that the City has not shown that the cost of repairs to each building exceeds 50% of each building's assessed value. It argues that the proper standard in calculating the cost of repair is the cost of making each building safe for use as a vacant, unoccupied building that is closed to the public. It then asserts that the City applied a standard of calculating the costs of repair based on the buildings' intended use as developed buildings open to the public rather than as vacant buildings.

¶3 Additionally, Black Spruce argues that the raze orders are unreasonable because it rebutted the presumption that the cost to repair each building was unreasonable and that the City acted in bad faith when it issued the three raze orders. In the alternative, Black Spruce argues that the City's raze orders should be modified to direct that Black Spruce be required to secure the buildings until Black Spruce is able to redevelop them.

¶4 The City argues that the orders issued in this case are reasonable because Black Spruce's buildings are so old, dilapidated, and out of repair that they are consequently dangerous, unsafe, unsanitary, and unreasonable to repair. It further argues that pursuant to the Milwaukee Code of Ordinances (MCO) § 218-4

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

(2017), and WIS. STAT. § 66.0413, Black Spruce's buildings are public nuisances and must be razed. The City asserts that it has shown that it is unreasonable to repair the buildings because the costs of repairing the buildings exceeds 50% of each building's assessed value.

¶5      We conclude that in rendering its decision the circuit court improperly based its findings on the cost to repair the buildings to make them compliant with code requirements for developed buildings open to the public when their current intended uses are as vacant, unoccupied buildings that are closed to the public. Accordingly, we are unable to determine the reasonableness of the raze orders. We reverse the circuit court's order and remand for the circuit court to apply the appropriate standard in calculating the cost to repair and reinstate any restraining orders applicable to these three raze orders or issue any relevant restraining orders consistent with this decision and consistent with WIS. STAT. § 66.0413.[2] Consequently, we do not address the remaining arguments.

## BACKGROUND

¶6      Black Spruce owns 9101 and 9009 North Granville Station Road and 8221 West Northridge Mall Road, Milwaukee. The buildings are part of what is known as the former Northridge Mall (the Mall), and the buildings consist of the former JC Penney store, the Yonkers store, the food court, and various other stores.[3]

---

[2] As noted below, the parties dispute whether any restraining orders were in place throughout the proceedings, but in any event after rendering its decision the circuit court ordered that "[a]ny restraining order relating to such raze orders is dissolved."

[3] The parties refer to the subjects of this appeal as Black Spruce's properties. For consistency with the relevant ordinances, statutes, and case law, we use buildings.

The Mall was closed in 2003, and Black Spruce, by its predecessor U.S. Toward Enterprise Group, Inc. came to own the buildings in 2008.

¶7     Another portion of the Mall—the former Boston Store—is currently owned by the City. That portion of the Mall was previously owned by Penzey's Spices until Penzey's donated this portion of the Mall to the City in 2018, after Penzey's was unable to secure ownership of the buildings owned by Black Spruce. Since the City has owned the Boston Store building, it has inspected the Mall in order to understand the building, how it connects to the remainder of the Mall, and how the City could potentially accomplish razing the Boston Store building.

¶8     The City issued three orders on April 11, 2019, pursuant to MCO § 218-4, to have the Black Spruce buildings razed. Each order provided that the buildings were to be razed because the buildings were vandalized, dilapidated, and out of repair; the cost to repair the buildings exceeded 50% of the value of the buildings and therefore, the cost to repair the buildings was presumed to be unreasonable; and the buildings were unsafe as defined in MCO § 200-11 and, therefore, public nuisances. Each raze order stated, "The building must be maintained vacant and secure from entry until you have complied with this order."

¶9     Black Spruce appealed the orders to the City of Milwaukee Standards and Appeals Commission (the Commission). In its decision, the circuit court stated that the Commission affirmed the raze orders based on MCO § 218-4-2-b. That ordinance provides:

> If the commissioner determines that the cost of such repairs would exceed 50 percent of the assessed value of such building divided by the ratio of the assessed value to the recommended value as last published by the Wisconsin

4

department of revenue for the city of Milwaukee,[4] such repairs shall be presumed unreasonable and it shall be presumed for the purposes of this section that the building is a public nuisance.

Black Spruce then filed a petition with the circuit court pursuant to WIS. STAT. § 66.0413(1)(h), seeking to enjoin the raze orders.[5]

¶10 In order to make the buildings secure until the resolution of these proceedings, the parties signed a stipulation for interim measures to be taken by Black Spruce to secure the buildings. The conditions of the stipulation stated:

> 2. Black Spruce shall contract to provide active, on-site, professional security monitoring of the subject properties twenty-four hours per day, 7 days a week. The service will keep logs on on-site activity and provide those to the City on a weekly basis.
>
> 3. Black Spruce shall repair and restore all fencing around the entire perimeter of its premises and shall place or replace "No Trespassing" signs at each entry point and at a frequency of not more than 30' between signs where such fencing exists.
>
> 4. Black Spruce shall execute the "No Trespass" form for the Milwaukee Police Department ("MPD"), which acts as an agreement to cooperate with the MPD in the prosecution of individuals caught trespassing on and in the properties.
>
> 5. Black Spruce shall remove all litter, debris, excess brush, etc. currently on the premises and, if new litter/debris/dumped materials appears, remove the same within two business days of such materials being reported to Black Spruce's local property manager. Black Spruce shall provide disposition reports for removed materials to ensure proper disposal. Black Spruce shall remove large growths

---

[4] For the ease of reading, as the parties do, we refer to this formula as the assessed value.

[5] Black Spruce originally filed a petition denominated as Milwaukee County Circuit Court Case No. 19-CV-6570 and omitted the 8221 West Northridge Mall Road property. Black Spruce filed a second petition denominated as Milwaukee County Circuit Court Case No. 19-CV-6587 and added 8221 West Northridge Mall Road. The court approved a stipulation by the parties that the petition filed as Case No. 19-CV-6587 would supersede the original petition filed as Case No. 19-CV-6570 and the petition in Case No. 19-CV-6570 would be voluntarily dismissed.

that provide cover for persons trying to break into the buildings at the doors.

6. The City and Black Spruce shall conduct a joint interior and exterior inspection of the buildings to identify access points to the buildings and measures to adequately secure them. The participants will include but are not necessarily limited to the company Black Spruce engages for security services, City of Milwaukee Department of Neighborhood Services, Milwaukee Police Department, and Milwaukee Fire Department.

¶11 The matter proceeded to an evidentiary hearing. At the hearing, the City presented testimony regarding the condition of the Black Spruce buildings and the cost to repair those buildings. In particular, the City presented the testimony of Inspector Tim Bolger, who testified regarding the condition of the Black Spruce buildings, the cost to repair the buildings, and how the cost to repair the buildings was calculated.[6] The City also presented the testimony of Inspector Chris Kraco, who testified regarding the condition of the buildings, to the presence of asbestos and other environmental hazards in the buildings, and the condemnation process.[7]

¶12 Benjamin Timm, a project manager employed by the City, also testified regarding the City's ownership of the Boston Store building, his inspections of the Mall building as a whole, and the City's efforts to obtain bids to demolish the

---

[6] Inspector Bolger prepared an estimated cost to repair each building using "an estimating book or tool" called RSMeans. Using this method, he prepared estimated costs to repair the buildings in April 2019 and estimated the costs to repair the buildings as follows: $2,900,000 for 9009 North Granville Station Road; $711,272 for 8221 West Northridge Mall Road; and $780,563 for 9101 North Granville Station Road. Based on updated information that he received, he prepared a second set of estimated costs to repair the buildings in July 2019 in the amounts of $7,456,273 for 9009 North Granville Station Road; $2,077,648 for 8221 West Northridge Mall Road; and $2,156,250 for 9101 North Granville State Road. According to Inspector Bolger's testimony, this did not include costs for asbestos and other environmental abatement measures that would be required for repairing the buildings.

[7] Witnesses from The Sigma Group, Inc., a civil and environmental engineering company in Milwaukee, testified about testing done on samples taken from inside the buildings and confirmed that the buildings did in fact contain asbestos and the costs associated with asbestos abatement at the buildings.

Boston Store building, which included abatement of the asbestos within the building. Milwaukee Police Department (MPD) Captain Heather Wurth also testified to the challenges that the MPD faces in entering the Black Spruce buildings and the complaints that the MPD receives about the activities there.

¶13 In general, the testimony introduced by the City demonstrated that, during the pendency of Black Spruce's ownership, its buildings have sat vacant and have fallen into disrepair. As a result, the buildings have been the repeated targets of trespassers and vandals. Plumbing, wire, and other items of value from inside the buildings have been removed, and the buildings are covered in graffiti. Damaged windows and walls also leave the buildings exposed to the elements, which in turn has resulted in water damage, flooding, and mold growth on the interior. Additionally, the MPD has received numerous calls about activity at the properties, including thefts, vandalism, and homeless individuals living in the buildings, but the MPD is unable to assist with all of the calls because of the volume of calls and the hazards the officers face when entering the buildings. Inspections and testing done by the City also showed that the buildings contain environmental hazards stemming mostly from asbestos and mercury switches, and piles of debris on the premises are evidence that the properties are being used as a dumping site.

¶14 Black Spruce called Yi Wan and Li Yang to testify regarding Black Spruce's ownership of the buildings and its efforts to maintain and develop them. Wan testified that Black Spruce was making continuous efforts to maintain the buildings by performing activities such as removing broken glass and other debris from them and boarding up windows. Wan further testified that Black Spruce was taking steps to secure the buildings and keep them free from trespassers by, for example, hiring twenty-four hour security at the properties and repairing broken fences. Yang, the Executive Director of Black Spruce, testified about Black

7

Spruce's efforts to develop its buildings and its meetings with the City to discuss development proposals for different commercial and light industrial uses.[8]  She testified that all of the proposals were rejected by the City.  According to Yang, Black Spruce's most recent development proposal was for an Asian Mart that would sell Asian goods at retail and wholesale.

¶15    The circuit court found that the raze orders were reasonable and upheld them.  Consequently, the circuit court dissolved any applicable restraining orders and ordered Black Spruce to begin the process of razing the buildings.[9]  In reaching its decision, the circuit court addressed the costs to repair the buildings.  It found that "[t]he estimated costs prepared by Inspector Bolger would be appropriate given Black Spruce's desire to rebuild the properties for commercial use" because "Black Spruce does not intend for the building to remain vacant and instead intends to build an Asian Mart shopping center."[10]  However, the circuit court also stated that "[w]hile Ms. Yang testified that Black Spruce has plans to redevelop the properties into an Asian Mart, this seems more of a vision at this point."  Further, it stated that "[h]ere, the repairs to the properties in this case are presumptively unreasonable as previously stated.  Accordingly, the City has the authority to issue the raze order for the properties in this case."  Thus, it rejected Black Spruce's argument that "the City included unnecessary costs in its estimates because the only

---

[8] One commercial proposal involved an Asian Mart, and one light industrial proposal involved processing grain products.

[9] The City contends that Black Spruce failed to submit a restraining order to the circuit court with its petition and the court did not issue a restraining order.  Black Spruce, on the other hand, contends that the raze order statute, WIS. STAT. § 66.0413(1)(h), automatically creates a restraining order.  We address these positions in more detail below.

[10] As noted above, the Asian Mart was only one of Black Spruce's proposals for development of the buildings.

repairs necessary at the present time are those necessary to make the building safe for the public in light of limited anticipated use."

¶16    Black Spruce appealed.

**DISCUSSION**

¶17    On appeal, Black Spruce raises multiple arguments that the City's raze orders are unreasonable.  Black Spruce first argues that the City failed to meet the necessary preconditions for issuing the raze orders.  As to this argument, Black Spruce contends that the buildings are not unsafe because the condition of the buildings has never caused injury to anyone and the buildings are not open to the public.  Black Spruce further contends that the buildings are currently vacant, unoccupied buildings that are closed to the public and, therefore, the costs to repair the buildings were improperly calculated and inflated as the result of the improper calculation.  Black Spruce next argues that it rebutted the presumption that the cost to repair the buildings is unreasonable and has established that the presumption operates in an arbitrary manner when applied to its buildings.  Last, Black Spruce argues that the raze orders are unreasonable due to the City's bad faith in its decision to issue the raze orders.

¶18    We conclude that the circuit court applied the wrong standard in calculating the cost to repair the buildings and improperly calculated the cost to repair based on an intended use as buildings that are redeveloped and open to the public.  Instead, we conclude that the appropriate standard is based on Black Spruce's current intended use of the buildings as vacant, unoccupied buildings from which the public is excluded, and the cost of repairs should reflect this current intended use.

### A. Applicable Raze Order Standards

¶19     Pursuant to statute, a municipality may issue a raze order

> [i]f a building is old, dilapidated or out of repair and consequently dangerous, unsafe, unsanitary or otherwise unfit for human habitation and unreasonable to repair, order the owner of the building to raze the building or, if the building can be made safe by reasonable repairs, order the owner to either make the building safe and sanitary or to raze the building, at the owner's option.

WIS. STAT. § 66.0413(1)(b)1.  Repairs are presumed unreasonable if "the cost of repairs" for the building "would exceed 50 percent of the assessed value of the building divided by the ratio of the assessed value to the recommended value as last published by the department of revenue for the municipality within which the building is located." WIS. STAT. § 66.0413(1)(c).  In other words, the standard is "whether the cost of repairs exceeds 50 percent of the value of the building." *City of Appleton v. Brunschweiler*, 52 Wis. 2d 303, 306, 190 N.W.2d 545 (1971); *see also Auto-Owners Ins. Co. v. City of Appleton*, 2017 WI App 62, ¶12, 378 Wis. 2d 155, 902 N.W.2d 532.  "If the cost exceeds this standard, the repairs shall be presumed unreasonable and the building is a public nuisance." *Brunschweiler*, 52 Wis. 2d at 306.

¶20     Additionally, as a first class city, the City has the power to "adopt by ordinance alternate or additional provisions governing the placarding, closing, razing and removal of a building and the restoration of the site to a dust-free and erosion-free condition." WIS. STAT. § 66.0413(4).  With this authority, the City has

adopted several ordinances, including and as relevant here MCO § 218-4, which mirrors the statutes.[11] MCO § 218-4-1 states:

> All such unsafe buildings, structures or parts thereof as defined in s. 200-11 or consistent with the conditions specified in s. 218-9-1, are declared to be a public nuisance, endangering life, limb, health or property, and shall be repaired and made safe, or razed and removed in compliance with this chapter, as ordered by the commissioner, pursuant to the authority provided in s. 66.0413(4), Wis. Stats.

The City has also adopted MCO § 218-4-2-b, which states:

> If the commissioner determines that the cost of such repairs would exceed 50 percent of the assessed value of such building divided by the ratio of the assessed value to the recommended value as last published by the Wisconsin department of revenue for the city of Milwaukee, such repairs shall be presumed unreasonable and it shall be presumed for the purposes of this section that the building is a public nuisance.

¶21    "A person affected" by a raze order issued pursuant to these sections may apply to the circuit court "for an order restraining the building inspector or other designated officer from razing the building." WIS. STAT. § 66.0413(1)(h). In such a case, "[t]he court shall determine whether the raze order is reasonable." *Id.*; *see also* ***Auto-Owners Ins. Co.***, 378 Wis. 2d 155, ¶23. "If the order is found reasonable the court shall dissolve the restraining order." Sec. 66.0413(1)(h). "If the order is found not reasonable the court shall continue the restraining order or modify it as the circumstances require." *Id.*

---

[11] As the City states, it acted pursuant to the authority in the MCO and the statutes. Moreover, MCO § 218-01 provides that the City adopts WIS. STAT. § 66.0413 as part of its code. Thus, we need not decide on what authority the City acted and whether it properly exercised an authority granted by § 66.0413(4) because our decision today is limited to the definition of the cost to repair, which is a phrase found in both the statute and the MCO.

11

¶22    "The reasonableness of a building inspector's order presents a question of law." ***Auto-Owners Ins. Co.***, 378 Wis. 2d 155, ¶24. However, "we give weight to the circuit court's determination" because its determination is "intertwined with its factual findings supporting that conclusion." ***Id.***

### B. The City's Raze Orders

¶23    Here, Black Spruce argues that the City's raze orders are unreasonable because it inflated the "cost of repairs" by improperly including repairs, such as repairs to the heating, plumbing, and electrical systems in the buildings, that are necessary to bring the buildings up to code for developed buildings open to the public. Black Spruce argues that instead, the cost of repairs should reflect the current intended use as vacant, unoccupied buildings that are closed to the public, and that Black Spruce should be allowed to maintain the buildings in their current state through continued compliance with the measures put in place by the parties' stipulation containing the necessary measures to secure the buildings. In other words, Black Spruce argues that the costs to repair should reflect the costs necessary to secure the buildings. To resolve Black Spruce's argument, we are required to determine what is included in the "cost of repairs" used in the calculation to determine whether the cost of repairs is presumptively unreasonable under WIS. STAT. § 66.0413(1)(c) and MCO § 218-4-2-b.[12]

¶24    "Statutory interpretation presents a question of law, which we review de novo." ***Auto-Owners Ins. Co.***, 378 Wis. 2d 155, ¶11; *see also* ***A&A Enters. v. City of Milwaukee***, 2008 WI App 43, ¶16, 308 Wis. 2d 479, 747 N.W.2d 751 (interpretation of ordinance is question of law). "[S]tatutory interpretation 'begins

_____

[12] Although the City asserts that Black Spruce does not have the option to repair the buildings because the costs of repairs is unreasonable, it does acknowledge that Black Spruce would have that option if the buildings can be made safe by reasonable repairs.

with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" ***State ex rel. Kalal v. Circuit Ct. for Dane Cnty.***, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted). "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." ***Id.***, ¶44.

¶25 The cost of repairs is not defined in the raze order statutes or the MCO; however, the cost of repairs has previously been determined to be "limited to the necessities of the case." ***Donley v. Boettcher***, 79 Wis. 2d 393, 404-05, 255 N.W.2d 574 (1977). In other words, the cost of repairs are only those that are considered necessary to remove the public nuisance and protect the public interest because "a municipality is required to use the least drastic way of removing a public nuisance." ***Id.***; *see also* ***Brunschweiler***, 52 Wis. 2d at 307 ("[A] municipality is required to use the least drastic way of removing a public nuisance and the owner must be given an opportunity to repair only if this is a reasonable alternative[.]").

¶26 Applying this principle, when the trial court modified a raze order to require a property owner to "install operable electrical service to the building and repair the heating and plumbing systems," our supreme court said that the cost of repairs "under the circumstances of this case, go further than necessary to protect the public from an old, dilapidated building." ***Donley***, 79 Wis. 2d at 407-08. The court in ***Donley*** stated:

> These repairs relate to making the building fit for human habitation, occupancy or use. As the testimony revealed, the public would have no access to this building, and there was no evidence of harm to the public from the interior or exterior of the building if the building were closed for any uses. Because the purpose of this statute is to eliminate hazards to the public associated with old, dilapidated buildings and not necessarily to make such buildings tenantable, the trial court's remedy went beyond the necessities of the case. The repairs ordered would restore

13

> the building to a condition in which it could again be used to house a law office and barbershop. The repairs were not required to make the building which was found not to be in danger of structural collapse, safe or sanitary for the public.

*Id.* at 407. The court determined that the cost of repairs cannot be determined "without considering the use to which the building is to be put" and because the property owner intended that the building remain vacant, the cost of repairs was required to reflect that intended use and limit measures used to abate a nuisance to the necessities of the case. *Id.* Thus, in determining the cost of repairs under the statute, the circuit court was required to consider the intended use of the building.

¶27 Thus, the question before the circuit court and this court is what was Black Spruce's intended use of the building at the time the raze orders were issued. As noted, Black Spruce argues that the current intended use of its buildings is as vacant, unoccupied buildings that are closed to the public and the cost of repairs should reflect this intended use. Because the City included the cost of repairs to make the buildings safe for public use and bring the buildings into compliance with code requirements for developed buildings open to the public, Black Spruce argues that the cost of repairs was improperly calculated. We agree, and we conclude that the cost to repair the buildings in this case was improperly calculated based on a scenario in which the buildings were developed and open to the public.

¶28 Based on the principle articulated in *Donley* that the cost of repairs must take into account the intended use of a building to limit abatement measures to the necessities of the case, we conclude that the costs of repairs were improperly calculated in this instance because the current intended use of the buildings is as vacant, unoccupied buildings from which the public is excluded. There is, thus, no need to include within the costs to repair the buildings the requirements needed to

bring the buildings up to code requirements and prepare a "white box"[13] estimate. In so doing, the City presented estimated costs to repair the buildings that went beyond the necessities of the case and went further than what was necessary to protect the public from buildings that Black Spruce currently intends to use as vacant and unoccupied and from which the public is excluded.

¶29   The City argues, and the circuit court agreed, that Black Spruce's intended use of the buildings is as an Asian Mart open to the public and, thus, its estimated costs to repair the buildings are appropriate. The City supports its argument citing *Village of Williams Bay v. Schiessle*, 138 Wis. 2d 83, 405 N.W.2d 695 (1987), where the court there considered it appropriate to include the cost of repairs needed to make the building safe for the public because of the property owner's intent to rent the building. *Id.* at 87-88. The court stated that, despite the building's current status as a vacant building, the property owner had ads in the local paper offering space within the building for rent, and these ads were evidence of an intended use to rent the building, as opposed to an intent for the building to remain vacant. *Id.* The court, therefore, considered the appropriate intended use as a building for rent instead of a vacant building, and considered the appropriate cost of repairs to be those repairs necessary to make the building safe for tenants. *Id.*

---

[13] Inspector Bolger testified at the hearing before the circuit court that he estimated the cost of repairs based on what he termed a "white box" estimate, meaning what it would take to bring the buildings into compliance with basic code requirements that would be necessary for any possible use of the buildings. He explained that he did not include everything that needed to be repaired on the buildings in his estimate because some of the required repairs would depend on the end use; however, he prepared his estimates on "commonalities" for all the possible uses under the commercial code applicable to Black Spruce's buildings. The exhibits introduced by the City at the hearing also show line items included in the calculation such as repairing garage doors, repairing skylights, and restoring electrical service, as part of the items included in Inspector Bolger's costs to repair the buildings.

¶30    However, the instant case is distinguishable from *Schiessle*. Unlike the property owner in *Schiessle*, Black Spruce has not determined how the buildings are intended to be used other than their current use as vacant, unoccupied buildings that are not open to the public. It has the desire to redevelop the buildings, but its "visions" of how to accomplish that have changed over time, in part because the City rejected some proposals. The City acknowledges that although Black Spruce desires to redevelop the buildings, it contends that "over its twelve years of ownership, [Black Spruce] has never brought forth any real plans for development." Further, the City's witnesses acknowledged Black Spruce's proposals for redevelopment, but denied that Black Spruce has submitted any official applications or applied for any permits for redevelopment of the buildings. As one witness testified, Black Spruce has only submitted "a conceptual-type of design," but it "was not a plan that could be submitted to move forward with development."

¶31    During the hearing before the circuit court, Timm, a project manager employed by the City, testified that Black Spruce has not submitted any applications for permits, Inspector Kraco testified that, at most, Black Spruce has presented a "conceptual plan" for an Asian Mart, and Inspector Bolger additionally testified that Black Spruce has provided only "a conceptual artist depiction of what the end use could be."[14]

¶32    During her testimony before the circuit court, Yang explained how Black Spruce's vision for development of the buildings kept changing. She testified

_____

[14] We note that Timm and Inspector Bolger's testimony reflects that any development plans for the properties are subject to City approval and City approval of any plan is speculative and that Black Spruce has not yet submitted any application seeking approval from the City to develop an Asian Mart.

16

that when she arrived in the United States in 2013, based on statements by the prior property owners, that the City was looking for a light industrial development for the buildings.[15] She further testified that Black Spruce presented a light industrial proposal involving processing grain products to the City, but that Rocky Marcoux, the Commissioner of the Department of City Development at the time, told her that the City would not approve the industrial proposal and would only approve a commercial proposal.

¶33 Yang also testified that Black Spruce then began developing a commercial proposal—an Asian Mart. She explained that Black Spruce partnered with the Metropolitan Association of Commerce (MMAC) so it could enter the EB-5 Program because the City recommended that Black Spruce participate in the EB-5 Program.[16] However, she explained that the process of applying for the EB-5 program ended in May 2016 when the MMAC sent Black Spruce an email terminating the project. She stated that this required Black Spruce to change its business plan again.

¶34 Moreover, Yang testified that Black Spruce's contractors and others involved in its potential development proposal as an Asian Mart all cancelled their meetings to discuss development plans with Black Spruce when the City issued the three raze orders at the heart of this case. Thus, any development proposals Black Spruce had or has are purely speculative such that they cannot be considered the

---

[15] Yang also testified that no one from the City ever told her that the City was looking for light industrial development for the buildings. However, we note that Timm testified that the City had discussed changing the zoning for the buildings from commercial to light industrial over the years and that is the market trend in the area. He further testified that he knew that Black Spruce talked about redeveloping the buildings with the City.

[16] Yang testified that the EB-5 Program is an investment immigration program run by the United States Citizenship and Immigration Service.

intended use of the properties for purposes of determining the costs of repairs. As the circuit court stated, "[w]hile Ms. Yang testified that Black Spruce has plans to redevelop the properties into an Asian Mart, this seems more of a vision at this point." In fact, the City itself recognizes the speculative nature of redevelopment as an Asian Mart when it estimated the cost of repairs based on a "white box" estimate that would apply regardless of the potential use. In other words, this is not the case presented in *Schiessle* where the property owner was advertising its building for rent such that the current status as a vacant building could not be considered the appropriate intended use. *See id.*, 138 Wis. 2d at 87.

¶35 We, thus, reject the City's argument that the intended use of the buildings should be based on an intended use as an Asian Mart that is open to the public. Black Spruce's intended use of the buildings at the time the raze orders were issued was as vacant, unoccupied buildings that are not open to the public. Therefore, the proper costs that the circuit court should consider in determining whether the raze orders are reasonable are the costs of making each building safe for use as a vacant, unoccupied building that is closed to the public.

*C. Restraining Order*

¶36 We note that the City contends that Black Spruce failed to submit a restraining order to the circuit court in this case and that Black Spruce contends that WIS. STAT. § 66.0413(1)(h) "had the effect of automatically restraining the City from taking or permitting steps" to raze the buildings. Neither party has fully developed their arguments as to the automatic creation of a restraining order upon a petition filed under § 66.0413(1)(h), and we will not do so for them. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). Thus, we do not address the parties' arguments on this matter, and we do not determine whether a

18

restraining order automatically takes effect upon judicial review sought under § 66.0413(1)(h).

¶37    Nevertheless, as a result of our decision, we reverse the circuit court's order in its entirety, which also has the effect of reversing that part of the circuit court's order that any applicable restraining orders be dissolved.  Therefore, we remand this matter with instructions to reinstate any applicable restraining orders that were dissolved by the circuit court's order or issue any appropriate restraining orders consistent with this decision and consistent with WIS. STAT. § 66.0413(1)(h) and for further proceedings consistent with this decision for the circuit court to determine whether the raze orders are reasonable applying the standard of the buildings as vacant, unoccupied buildings that are closed to the public.

## CONCLUSION

¶38    In sum, we conclude that the costs of repairs were improperly calculated when the costs were calculated using repairs that would be required for the buildings to be redeveloped, brought up to code, and made open to the public. Thus, we are unable to determine the reasonableness of the raze orders at issue.  The buildings are currently vacant, unoccupied buildings from which the public is excluded and Black Spruce intends to continue to use the properties as such at the present time.  We, therefore, reverse the circuit court's order upholding the City's three raze orders as reasonable, and we remand with instructions to apply the appropriate standard we have articulated today and reissue any applicable

restraining orders or issue any relevant restraining orders consistent with this decision and consistent with WIS. STAT. § 66.0413(1)(h).[17]

*By the Court.*—Order reversed and cause remanded with directions.

---

[17] We further note that the City based the issuance of the raze orders on the grounds that Black Spruce's properties are so old, dilapidated, and out of repair that they are consequently dangerous, unsafe, unsanitary, and unreasonable to repair because the cost of repairing the properties exceeds 50% of each property's assessed value. Thus, it asserts that pursuant to the MCO § 218-4, and WIS. STAT. § 66.0413 Black Spruce's properties are public nuisances and must be razed. This decision is limited to those grounds asserted by the City and, therefore, this court does not express any opinion whether the City may issue raze orders based upon any other grounds pursuant to WIS. STAT. § 66.0413 or MCO § 218-4.

No.  2020AP1113(D)

¶39    DONALD, P.J. (*dissenting*).  I disagree with the Majority that the circuit court improperly calculated the cost to repair Black Spruce's buildings.[1]  *See* Majority, ¶18.  I, therefore, respectfully dissent.

¶40    Whether a raze order is reasonable is a question of law.  *Village of Williams Bay v. Schiessle*, 138 Wis. 2d 83, 88, 405 N.W.2d 695 (Ct. App. 1987).  "[H]owever, the finding of unreasonableness is so intertwined with the [circuit] court's factual findings that we will give more credence to this legal determination by the [circuit] court than we do with other legal questions."  *Id.*  Moreover, we will not set aside the circuit court's factual findings unless they are clearly erroneous.  *A & A Enters. v. City of Milwaukee*, 2008 WI App 43, ¶17, 308 Wis. 2d 479, 747 N.W.2d 751; WIS. STAT. § 805.17(2).  The circuit court is the ultimate arbiter of the witnesses' credibility.  *See Posnanski v. City of West Allis*, 61 Wis. 2d 461, 465, 213 N.W.2d 51 (1973).

¶41    The Majority concludes that the circuit court improperly calculated the cost to repair the buildings "based on an intended use as buildings that are redeveloped and open to the public."  Majority, ¶¶5, 18.  According to the Majority, "the appropriate standard is based on Black Spruce's current intended use of the buildings as vacant, unoccupied buildings from which the public is excluded[.]"  Majority, ¶18.

---

[1]  Like the Majority, we use the term "buildings" as opposed to "properties."  *See* Majority, ¶6 n.3.

¶42 I agree with the Majority that when determining the cost of repairs needed, the circuit court must "consider[] the use to which the building is to be put." ***Donley v. Boettcher***, 79 Wis. 2d 393, 407, 255 N.W.2d 574 (1977); *see* Majority, ¶26. I disagree, however, with the Majority's conclusion regarding the intended use of the buildings.

¶43 Two cases are instructive regarding the intended use of the buildings—***Donley*** and ***Schiessle***. ***Donley*** involved a vacant, two-story building that previously had been used for law offices and a barbershop. ***Id.***, 79 Wis. 2d at 399-400. The circuit court in ***Donley*** ordered repairs to restore the building to a condition where it could be used again as a law office and a barbershop. *See **id.*** at 401-02, 407. Donley moved for modification of the order, arguing that it was "his intention to let the building remain vacant" and the repairs ordered insofar as they related to the heat, electricity, and plumbing did not affect "the health, safety or welfare of the public because the building [was] not open for use or occupancy by the public." ***Id.*** at 402. The circuit court denied the motion and Donley appealed. ***Id.*** at 402-03.

¶44 Our supreme court agreed with Donley and held that the circuit court "went beyond the necessities of the case." ***Id.*** at 407. The supreme court stated that

> [the] repairs relate to making the building fit for human habitation, occupancy or use. As the testimony revealed, the public would have no access to this building, and there was no evidence of harm to the public from the interior or exterior of the building if the building were closed for any uses. Because the purpose of this statute is to eliminate hazards to the public associated with old, dilapidated buildings and not necessarily to make such buildings tenantable, the trial court's remedy went beyond the necessities of the case. The repairs ordered would restore the building to a condition in which it could again be used to house a law office and barbershop. The repairs were not

required to make the building which was found not to be in danger of structural collapse, safe or sanitary for the public.

*Id.*

¶45 Subsequently, in *Schiessle*, we examined a challenge to a building inspector's order for four buildings to be razed and removed. *Id.*, 138 Wis. 2d at 84. As in *Donley*, the defendants in *Schiessle* argued that the only relevant repairs were "those necessary to make the buildings structurally sound such that they are not in danger of collapse and are safe and sanitary for the public." *Schiessle,* 138 Wis. 2d at 86. We rejected the defendants' argument, stating that *Donley* was "easily distinguishable." *Schiessle*, 138 Wis. 2d at 87. We explained that:

> In *Donley*, *the owner had no intention of allowing human habitation in the building. He was not intending to again house a barbershop and law office*. Since the purpose of the statute is to eliminate hazards to the public, and since the public would not be allowed in the building, the repairs necessary in that case were only those required to make the building safe for the public as it was *intended to be used*.
>
> Here, however, the evidence is that [the] defendants intended to rent the property. Ads had appeared in the local paper offering the buildings for rent, which ads appeared for about four months.

*Schiessle*, 138 Wis. 2d at 87 (emphasis added). Thus, we rejected the defendants' challenge to the raze orders. *Id.* at 88.

¶46 In this case, the circuit court explicitly found that "Black Spruce does not intend for the building[s] to remain vacant and instead intends to build an Asian Mart shopping center." Thus, the circuit court found that this case was distinguishable from *Donley* where the owner intended the building to remain vacant. The circuit court also noted that, unlike in *Donley*, which involved a two-story building, Black Spruce's properties are "large and consist of buildings that are

made up of a former shopping mall."[2] Finally, the circuit court observed that the "[t]estimony at trial also showed that the buildings are not truly vacant, given the amount of trespassing complaints and evidence showing that people regularly access these buildings."

¶47 To support its conclusion that Black Spruce's intended use of the buildings was as "vacant, unoccupied buildings," the Majority notes testimony that Black Spruce had not submitted any official applications or applied for permits, and that its plan for an Asian Mart was "conceptual." Majority, ¶¶30-31. The Majority also notes the circuit court's statement that Black Spruce's plan to redevelop the buildings "seems more of a vision at this point." Majority, ¶34.

¶48 The Majority reads an extra requirement into *Donley* and *Schiessle*. These cases do not require that an owner of a property have a detailed, developed plan. Rather, these cases simply require that a circuit court look at the owner's intended use of the premises. *See Donley*, 79 Wis. 2d at 407; *Schiessle*, 138 Wis. 2d at 87. Here, the circuit court found that Black Spruce's intent was to build an Asian Mart shopping center. Such a finding is supported in the record. As the circuit court noted, at trial, Li Yang, the Executive Director and representative of Black Spruce, testified that the plan for the buildings was to develop them into an Asian Mart.

¶49 The Majority suggests that this case is distinguishable from *Schiessle* because there, advertisements appeared in the local paper offering the buildings for rent. *See* Majority, ¶34; *Schiessle*, 138 Wis. 2d at 87. The fact that advertisements appeared in the local paper, however, was simply evidence supporting the

---

[2] The buildings owned by Black Spruce totaled approximately 800,000 square feet.

defendants' intent to rent the property; not a requirement that a property owner have a detailed, developed plan. *See Schiessle*, 138 Wis. 2d at 87.

¶50    Moreover, even if *Schiessle* requires that some type of action be taken by a property owner to find a specific intent, here, the evidence reflects that Black Spruce did take actions evincing its intent to build an Asian Mart shopping center. After the City indicated they would not support an industrial plan, Yang testified that Black Spruce developed a commercial plan for an Asian Mart. Black Spruce presented the plan to the City and the Metropolitan Milwaukee Association of Commerce (MMAC), and hired an attorney's office to prepare an EB-5 investment program application. After MMAC terminated the EB-5 project, Black Spruce then redeveloped its business plan for an Asian Mart and had meetings scheduled with designers and contractors for the plan before the raze order was made public. Thus, the evidence reflects that Black Spruce's intent was to develop the buildings into an Asian Mart, not for the buildings to remain vacant.

¶51    Therefore, I would find that the cost of repairs were properly calculated. Accordingly, I respectfully dissent.